**UNIJAX, INC., Plaintiff-Appellant,**

v.

**CHAMPION INTERNATIONAL, INC., Defendant-Appellee.**

**No. 258, Docket 81–7433.**

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1981.

Decided June 21, 1982.

---

Stuart A. Jackson, New York City (Burns, Jackson, Summit, Rovins & Spitzer, Michael G. Shannon, New York City, of counsel), for plaintiff-appellant.

Stephen M. Hudspeth, New York City (Lord, Day & Lord, Darrell E. Prescott, Douglas F. Broder, New York City, of counsel), for defendant-appellee.

Before MOORE and NEWMAN, Circuit Judges; GRIESA,* District Judge.

MOORE, Circuit Judge:

Unijax, Inc. ("Unijax") appeals from a judgment of the United States District Court for the Southern District of New York, 516 F.Supp. 941, Honorable Robert L. Carter, Judge, granting Champion International, Inc.'s ("Champion") motion for judgment notwithstanding the verdict ("judgment n. o. v."). Unijax, a wholesale fine paper distributor,[1] charged in its complaint that during 1975, 1976 and 1977, Champion, a manufacturer of fine paper products, violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1976), and Section 3 of the Clayton Act, 15 U.S.C. § 14 (1976), by imposing upon certain Unijax branches exclusive dealing agreements and by conditioning the sale of its coated printing paper, known as Kromekote, on the purchase of other Champion commodity uncoated pa-

---

* Honorable Thomas P. Griesa, United States District Judge for the Southern District of New York, sitting by designation.

1. Fine paper consists primarily of printing and writing papers and can be divided into two broad categories, coated and uncoated papers. Coated printing paper is used for high quality printing and is used where a sharp, clear image is desired for brochures, magazines, periodicals, and the like. Uncoated paper is used primarily for printing, writing, and for conversion into envelopes, business forms, and related products.

per.[2] Unijax's complaint also alleged that Champion maliciously interfered with an existing contractual agreement and prospective business relations between Unijax and one of its principal customers, in violation of Tennessee law.

The case was bifurcated for trial on the issues of liability and damages and went to trial before a jury from December, 1979 to January, 1980. After a trial on the issue of liability, the jury found that Champion had coerced Unijax to enter into a tying arrangement, in violation of Section 3 of the Clayton Act,[3] and had tortiously interfered with an existing contractual agreement and prospective business between Unijax and one of its principal customers, Holiday Press. The jury also found that Unijax failed to establish that Champion forced it to participate in exclusive dealership agreements.[4]

Champion moved for judgment n. o. v. on the antitrust and common law claims and on the issues of damages. Unijax moved for judgment n. o. v. on the jury's verdict that it failed to demonstrate foreclosure of a not insubstantial amount of commerce in the tied products and on other elements of the jury's liability verdict.

After carefully reviewing the record, which included extensive post-trial briefs in support of, and in opposition to, motions for judgment n. o. v.,[5] the district court granted Champion's motion,[6] dismissing with preju-

2. Unijax also asserted claims for monopolization and violation of the Robinson-Patman Act, 15 U.S.C. § 13(e)(1976). These claims were dismissed with prejudice before trial.

3. Although Unijax alleged in its complaint and at trial that Champion had violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1976), as well as Section 3 of the Clayton Act, 15 U.S.C. § 14 (1976), the jury found Champion liable only on the Clayton Act claim. Accordingly, the only provision of law relevant to the tying claim on appeal is Section 3 of the Clayton Act.

4. The trial immediately proceeded to the issue of damages. The jury awarded $726,742 (before trebling) to Unijax on its antitrust claim, $583,940.27 on its claim of tortious interference with prospective business advantage, $500,000 of which represented an award for punitive damages, and $11,840.89 on its claim of tortious interference with an existing contract, $5,000 of which represented an award for punitive damages.

5. Six lengthy memoranda of law, totalling 486 pages, were submitted to the trial judge in support of, and in opposition to, the respective motions for judgment n. o. v. The parties included these memoranda in their joint appendix on appeal.

6. In reaching his conclusion to grant Champion's motion for judgment n. o. v., Judge Carter set forth the salient facts and controlling principles of law in a comprehensive opinion, in part as follows:

"The controlling principle that guides trial courts in this circuit to decision on motions for directed verdicts and judgments n. o. v. is 'whether the evidence is such that without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.' Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970). In considering a motion for judgment n. o. v., the evidence must be viewed in the light most favorable to the non-moving party and 'will be granted only if (1) there is a complete absence of probative evidence to support the verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair-minded men in the exercise of impartial judgment could not arrive at a verdict against him.' (citations omitted) Armstrong v. Commerce Tankers Corp., 423 F.2d 957, 959 (2d Cir.), cert. denied, 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970); Noonan v. Midland Capital Corp., 453 F.2d 459, 461 (2d Cir.), cert. denied, 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 333 (1972). Most recently in Mattivi v. South African Marine Corp., 'Hugenot', 618 F.2d 163, 167 (2d Cir. 1980), the above principle was reaffirmed as the controlling yardstick to be utilized in making directed verdict or judgment n. o. v. determinations."

\* \* \* \* \* \*

"The basic requirement for a tying agreement is that there be two separate and distinct products, and an agreement by defendant to sell plaintiff one product only on condition that the latter also purchase the other product. Northern Pacific R. Co. v. United States, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). While there was testimony concerning Kromekote's uniqueness, there was absent any evidence, on a fair reading of this record, that plaintiff had to buy a different Champion product or products to secure Kromekote. Absent such proof, there can be no illegal tying agreement."

dice Unijax's antitrust claim and common law tort claim of interference with prospective business advantage.[7] Judge Carter concluded that there was *no* evidence that Champion required or coerced Unijax to purchase other grades of Champion paper as a condition to receiving the Kromekote grade of coated papers,[8] or that Champion, motivated by malice, actively sought the business of Holiday Press. Accordingly, Judge Carter set aside the jury's award to Unijax on its antitrust claim and on its claim of tortious interference with prospective business advantage.

On appeal, Unijax contends that the evidence was sufficient to permit reasonable jurors to find that Champion had impermissibly tied sales of a grade of fine coated paper, the Kromekote grade, to the purchase of other Champion coated and uncoated paper grades, in violation of Section 3 of the Clayton Act, and that Champion had tortiously interfered with prospective business between Unijax and one of its principal customers, in violation of Tennessee law. We reject Unijax's contentions and hold that Judge Carter correctly concluded that even when the evidence is viewed in the light most favorable to Unijax, a reasonable juror could not find that these allegations had been proved. Accordingly, we find that the district court did not err in granting Champion's motion for judgment n. o. v., and for the reasons set forth below, we affirm.

## FACTS ADDUCED AT TRIAL

In light of the trial court's holding that there was no proof of a tying arrangement, a somewhat brief review of the facts is necessary.

Champion is a manufacturer of fine paper products. The company also distributes paper products through its division Nationwide Papers. Unijax is a wholesale fine paper distributor with branches in seventeen cities located primarily in the southeastern region of the United States. Unijax purchases and resells paper products manufactured by Champion and at least ten other companies.

The two companies have maintained a long-standing business relationship. Unijax has distributed Champion papers for over forty years. From 1971 and 1976, however, the relationship between Champion and the Unijax branches in Florida and Georgia steadily deteriorated. Champion became dissatisfied with Unijax's performance in selling Champion products[9] and believed that Unijax was either unwilling or unable to improve its performance.

Beginning in January, 1972, Earle Bensing, Champion's Sales Manager for the Atlanta District,[10] met with Walter Moore, President and Chief Executive Officer of Unijax, and other Unijax personnel to discuss means of improving Unijax's performance in distributing Champion's products. In April, 1972, executives from the two companies, including Moore and Bensing, met at Champion's offices in Hamilton, Ohio, to discuss the continued deterioration in Unijax's performance and to establish a series of sales goals to assist in increasing Unijax's purchases of Champion products. These goals were never reached.

In September, 1972, an internal memorandum written by John Fox, a Unijax Vice

---

7. The district court sustained the jury's findings: (1) that Unijax failed to establish that it was coerced into purchasing fine paper *exclusively* from Champion, and (2) that Champion tortiously interfered with an existing contractual agreement. Accordingly, the district court entered judgment for plaintiff on its contract claim. Neither party raises these issues on appeal.

8. Judge Carter stated:
   "Since I hold there was no proof of a tie and since such proof was necessary on this record to support plaintiff's antitrust claims,

defendant's other arguments in support of its motion for judgment n. o. v. on the antitrust issues need not be reached. Judgment n. o. v. is granted defendant on the antitrust issues."

9. In 1971, Unijax's five branches in Florida sold 8,786 tons of all grades of Champion paper. In 1975, these branches sold 1,393 tons, a decline of approximately 80%.

10. The Atlanta district included Florida and Georgia.

President, indicated that Unijax had not improved its performance. Moore feared that Champion would either appoint additional distributors or terminate some or all of Unijax's branches.

The paper industry experienced a widespread paper shortage in the early months of 1974. Champion found it impossible to keep pace with demand, and was able to sell easily virtually every type of fine paper. In fact, Champion was forced to implement a system of allocations. As a result, its distributors, including Unijax, constantly requested supplemental allotments.

During this period, Sales Manager Bensing, according to Moore, stated that Unijax ought to use its full allotment of the Javelin grade of coated paper which was also manufactured by Champion before it requested an additional allotment of the Kromekote grade of coated paper. At no time, however, did Champion condition its sales of Kromekote on Unijax's purchase of other Champion products. Toward the end of 1974, the paper shortage lessened, and Champion once again submitted critical performance reviews to Unijax. In March, 1975, Bensing sent a series of performance review letters to the distributors of Champion fine paper in his sales area. The letters to the Unijax branches in Florida and Georgia criticized their sales performance on all grades of paper, including the Kromekote grade.

In 1975, Champion began doing business with another Florida distributor in an effort to increase paper sales in the area. During this year, Champion also refused Unijax's request to supply its products to the Unijax branch in Indianapolis. Champion informed Unijax when this decision was made that it would not service the Indianapolis branch because it already had established an adequate distribution system in Indianapolis.

In September, 1975, certain other Unijax branches, including the five branches in Florida, received another set of review letters criticizing Unijax's poor performance in selling Champion products. The letters specifically criticized Unijax's failure to sell adequate amounts of the Kromekote grade. The letters do not suggest that Unijax needed to purchase other Champion paper products in order to obtain the Kromekote grade.

On October 30, 1975, Bensing, in another attempt to encourage Unijax to purchase more Champion products, again met with Moore. Bensing informed him that Champion might cease supplying the Unijax branches in Miami and Tampa because of their poor performance. Bensing did not tell Unijax which grades to buy or attempt in any way to condition sales of the Kromekote grade. Moreover, Moore did not indicate that he wanted to purchase only the Kromekote grade. As Moore testified:

"No one from Champion said it's to be Javelin or Javelin and Wedgewood or any particular grades, the quantities or anything else.

Our own people decided what to stock and how much of that to put in. Our own people did that. They are the only people capable of doing that. They made those decisions."

\*     \*     \*     \*     \*     \*

"He [Bensing] did not say you must buy Javelin, Wedgewood, or anything like that. I have never said that. We independently decided what to buy of the Champion products. I told my people to buy Champion products."

Shortly thereafter, Moore issued a directive to the Unijax branches in Florida to increase their inventories of Champion paper. He did not ask the outlets, however, to buy more of any particular Champion grades. In the directive, Moore expressed concern about the possible loss of the Champion line if increased purchases of the company's products were not made.

Throughout 1975, the performance of the Unijax branches in Florida remained poor. In January, 1976, Moore received a letter, in response to one from Moore, which catalogued Champion's criticisms of Unijax's performance during the previous four years. There is no mention in this letter of conditioning the sale of Kromekote on the sale of other paper grades.

On February 17, 1976, Unijax's senior management officials, including Moore and Julian Humphries, the company's Executive Vice-President, met with officials from Champion. Mark Fuller of Champion hand delivered to Moore a letter dated February 13, 1976, informing Unijax of Champion's decision to terminate business as of June 1, 1976 with Unijax's distribution outlets in Miami, Tallahassee, Tampa, Orlando, Jacksonville, Macon, and Atlanta.[11] There is no evidence that at this meeting, Champion conditioned the further supply of any of its products to these branches on Unijax's purchase of other Champion coated or uncoated paper grades.

After Champion terminated sales to these branches, Unijax issued instructions to its non-terminated branches to buy more Champion paper products. No evidence exists, however, that this action was prompted by threats from Champion that it would condition the sale of the Kromekote grade on the purchase of other grades of paper, or that Unijax ever sought to purchase only the Kromekote grade from Champion.

In March, 1976, Fuller met with Moore at the latter's request. Moore orally agreed not to sue Champion in connection with the five Florida terminations and agreed not to halt Unijax's purchases of envelope paper from Champion. Moore specifically requested that Champion continue supplying Unijax's Atlanta and Macon branches. Kromekote was not mentioned at this meeting.

In April, 1976, senior officials from both companies, including Moore, Fuller, and Bensing, met at the Champion district sales office in Atlanta to discuss a sales plan for the Unijax branches in Atlanta and Macon. According to Moore's testimony, the parties agreed upon sales goals for Unijax and placed the Atlanta and Macon branches on a trial basis for one year. There was no reference at this meeting to the possibility of Champion withholding the Kromekote grade from Unijax. In fact, the sales goals had included specific goals for the Kromekote grade.

Unijax contends that after the Florida terminations, its non-terminated branches bought paper from Champion that they otherwise would not have purchased. Moore testified that Unijax was very much interested in obtaining the Kromekote grade of coated papers and that increased purchases of Champion products were intended to insure that the supply of the Kromekote grade would not be discontinued. Thus, Moore instructed his regional general managers to purchase paper from Champion rather than other suppliers unless ordered by the customer to do otherwise.

Although each Unijax branch made its own purchasing decisions, Unijax failed to present the testimony of managers or salesmen from the branches where the allegedly tied purchases were made. By contrast, testimony from William Chable, Champion's Atlanta District Sales Manager, and Peter Wittman, a Champion sales representative who regularly visited several of Unijax's branches in the Atlanta District, indicates that increased purchases were made to satisfy customer specifications for Champion products, to fill state bids on which Unijax had requested Champion's participation, and, in at least one case, to supply Unijax after default by another supplier.

A few additional facts relevant only to Unijax's common law claim of tortious interference with prospective business advantage need be discussed. In 1976, Franklin Ray, a fine paper salesman employed by the Unijax branch in Memphis, Tennessee, became dissatisfied with the company and decided to seek a new employer. On August 18, 1976, Ray tendered his resignation to the sales manager of the Memphis branch.

At the time of Ray's departure, Unijax's Memphis branch had an order from Holiday Press, one of its principal customers, for the purchase of Armour Web, a line of fine paper manufactured by Champion. On the day of his departure, Ray instructed Lloyd Scott Barnard, Champion's district manager in St. Louis, to cancel the order for the Armour Web grade placed with Champion by Unijax on behalf of Holiday Press.

11. Counsel for Unijax at trial stated that "our real complaint here has to do with Florida".

Shortly thereafter, Nationwide Papers ("Nationwide"), a division of Champion engaged in the distribution of paper products, hired Ray. Champion had never granted Unijax an exclusive right to sell Champion paper products in the Memphis region, and Nationwide sought to increase its accounts in this area. As a Nationwide employee, Ray obtained the business of many accounts that he had served while an employee of the Unijax branch in Memphis. In fact, Ray placed an order for the Armour Web grade for Holiday Press through Nationwide identical to the order which he had cancelled on August 18.

## DISCUSSION

In evaluating Unijax's claim that it presented sufficient evidence to support the jury's verdict, we exercise only a narrow scope of review. We may not weigh conflicting evidence, judge the credibility of witnesses, or substitute our judgment for that of the jury. Rather, we are bound to view the evidence, including all reasonable inferences to be drawn therefrom, in the light most favorable to the prevailing party, even though contrary inferences might reasonably be drawn. *See, e.g., Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962); *Michelman v. Clark-Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1042 (2d Cir.), *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976).

■ However, "[t]he jury's role as the finder of fact does not entitle it to return a verdict based only on confusion, speculation or prejudice; its verdict must be reasonably based on evidence presented at trial". *Mi-*

*chelman v. Clark-Schwebel Fiber Glass Corp., supra,* 534 F.2d at 1042. *See also H. L. Moore Drug Exchange v. Eli Lilly & Co.,* 662 F.2d 935 (2d Cir. 1981), *petition for cert. filed,* 50 U.S.L.W. 3984 (U.S. May 28, 1982) (No. 81–2215). Judgment n. o. v. permits the trial court to correct a jury's decision where "(1) there is a complete absence probative evidence to support the verdict for the [prevailing party] or (2) the evidence is so strong and overwhelmingly in favor of the [non-prevailing] party that reasonable and fair-minded men in the exercise of impartial judgment could not arrive at a verdict against [it]". *Armstrong v. Commerce Tankers Corp.,* 423 F.2d 957, 959 (2d Cir.), *cert. denied,* 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970). *See also Gehrhardt v. General Motors Corp.,* 581 F.2d 7, 14 (2d Cir. 1978); *Noonan v. Midland Capital Corp.,* 453 F.2d 459, 461 (2d Cir.), *cert. denied,* 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 333 (1972). Thus, if after viewing the evidence in the light most favorable to Unijax, we are convinced that the jury's verdict is not supported by sufficient evidence under this standard, we must affirm the district court's grant of judgment n. o. v. in favor of Champion.

■ The principal question on appeal is whether Unijax presented any evidence to permit reasonable minds to conclude that during 1975, 1976, and 1977, there was a tying arrangement or that Champion coerced Unijax into making such an arrangement, in violation of Section 3 of the Clayton Act.[12] A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) prod-

---

12. In numerous cases filed in federal court, parties cloak simple contract or fraud claims in the mantle of antitrust violations. As Judge Goettel commented in *Reisner v. General Motors Corp.,* 511 F.Supp. 1167, 1178 n.25 (D.C.N.Y.):

"Numerous cases are filed in the federal district courts attempting to make antitrust claims out of what are, at most, contract claims or fraud claims involving conduct between two parties. Such cases are troublesome because of the inherent difficulty of trying to prove a negative and because of the

exceedingly broad and general language of the antitrust laws, particularly the Sherman Act. Such claims are regularly dismissed, however, after taking up considerable amounts of judicial time. *See, e.g., Bucher v. Shumway,* 452 F.Supp. 1288, 1291–93 (S.D.N.Y.1978) (fixing the price of a particular securities purchase was not cognizable under the antitrust laws); *Madison Fund, Inc. v. Charter Co.,* 406 F.Supp. 749, 751 (S.D.N.Y.1975) (antitrust laws 'not designed to police the performance of private contracts')."

uct". *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Actual coercion by the seller that in fact forces the buyer to purchase the tied product is an indispensable element of a tying violation. *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 57 (2d Cir. 1980); *Capital Temporaries, Inc. v. Olsten Corp.*, 506 F.2d 658, 661–62 (2d Cir. 1974). A manufacturer's use of "strong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce [its] retailer to buy its full line of products" does not, however, amount to actual coercion. *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). Actual coercion supporting a finding of a tying violation is present only if the manufacturer goes beyond persuasion and conditions its retailer's purchase of one product on the purchase of another product. *Id.*

■ Accordingly, if the evidence merely demonstrates that Champion was dissatisfied with Unijax's performance and threatened to cease supplying the company unless sales were increased, there would not be sufficient evidence for the jury's determination that an illegal tying arrangement existed, and judgment n. o. v. would be properly granted. *See Osborn v. Sinclair Refining Co.*, 286 F.2d 832, 836 (4th Cir. 1960), *cert. denied*, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961), *on remand*, 207 F.Supp. 856 (D.Md.1962), *rev'd on other grounds*, 324 F.2d 566 (4th Cir. 1963). A contrary position would subject manufacturers to threats of antitrust sanctions whenever they tried to improve a sagging market position through strong encouragement of their distributors to purchase two or more products at one time. *See American Manufacturers Mutual Insurance Company v. American Broadcasting-Paramount Theatres, Inc.*, 446 F.2d 1131, 1137 (2d Cir. 1971), *cert. denied*, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972).

■ Judging the facts of this case against these standards, the trial judge properly granted Champion's motion for judgment n. o. v. The evidence,[13] even when viewed in the light most favorable to Unijax, fails to provide any support for the jury's determination that there was an illegal tying arrangement.

The record reveals, at most, continuing efforts by Champion to improve what it could reasonably view as Unijax's inadequate performance in distributing Champion products. Champion's policy was to persuade all its retailers to carry its complete line of fine paper products. Naturally, Champion also vigorously encouraged Unijax to purchase all grades of Champion paper, including the Kromekote grade.[14] On numerous occasions, management officials from the two companies had met to discuss methods of improving Unijax's performance and to establish sales goals for Kromekote as well as for other grades of paper. Champion, however, did not place any condition on Unijax's purchase of the Kromekote grade. Unsuccessful in its efforts to exhort Unijax to meet agreed upon sales goals, Champion ultimately stopped supplying several Unijax branches in areas where it had alternate distribution channels. This conduct, which Unijax asserts was unlawful coercive behavior, is nothing more than aggressive salesmanship[15] and is

13. More than 5,000 pages of testimony and voluminous exhibits were admitted into evidence and reviewed by this Court in reaching its decision.

14. Review letters from Champion to the Unijax branches in Columbia, South Carolina and Atlanta indicate that Champion specifically urged Unijax to purchase additional quantities of the Kromekote grade paper. Champion's letter to the Columbia branch states: "We need your assistance in improving our penetration on both Kromekote as well as our coated book papers ...." The Champion review letter to

the Atlanta branch comments: "Another area of disappointment, particularly with our promotional efforts, was the drop in Kromekote...." These letters do not contain any suggestion that Unijax needed to purchase other grades of paper in order to obtain the Kromekote grade.

15. Acts of aggressive salesmanship are protected and encouraged by the antitrust laws. "The purpose of the antitrust laws is to stimulate economic competition, the essence of which is the presence of many competing sellers: salesmanship—that art of persuasion and influ-

therefore insufficient evidence to support a finding of the actual exercise of economic muscle, an indispensable element for proving a tying violation. *See Davis v. Marathon Oil Co.*, 528 F.2d 395 (6th Cir. 1975), *cert. denied*, 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976).

In *Davis v. Marathon Oil Co., supra*, the Sixth Circuit held that evidence of aggressive salesmanship, substantially identical to the evidence in the case before us, was insufficient to support the jury's finding of a coerced tying arrangement under either Section 1 of the Sherman Act or Section 3 of the Clayton Act, and affirmed the trial court's order granting defendant Marathon Oil Company's ("Marathon") motion for judgment n. o. v. The plaintiff in *Davis*, a service station owner, claimed that Marathon had tied unwanted tires, batteries, and accessories (TBA) to his service station franchise lease and gasoline supply, and had ultimately terminated the franchise because of his low TBA sales volume. Plaintiff tried to prove coercion by introducing evidence that prior to termination, Marathon had complained that plaintiff's purchases of TBA were too low; had threatened plaintiff with termination of his lease (the tying product) unless he purchased more TBA from Marathon; and had in fact later terminated plaintiff's lease in part because his sales of Marathon-sponsored TBA were insufficient. *Id.* at 400–01. The Court found as a matter of law that plaintiff had proved nothing more than aggressive salesmanship, since there was no evidence that Marathon had withheld the tying product or threatened to withhold the tying product in order to coerce purchases of the tied product.

Unijax, like the plaintiff in *Davis*, failed to introduce any evidence that Champion had ever required, or even threatened to require, the company to purchase various grades of Champion's other fine paper or face a cutoff of the Kromekote grade. Moreover, Unijax did not present any evidence that it sought to purchase only the Kromekote grade and that Champion would

not permit it to do so. Indeed, the testimony demonstrates that Unijax willingly purchased the purportedly tied products. We have previously held that unless the buyer can prove that it was the unwilling purchaser of the allegedly tied products, actual coercion has not been established and a tying agreement cannot be found to exist. *Capital Temporaries, Inc. v. Olsten Corp., supra*, 506 F.2d at 663.

During a period of necessitous delay in reviewing this voluminous record, the exhibits and the lengthy briefs *pro* and *con*, two cases pointing to the correct decision in this case have been decided in this Circuit to one of which reference has previously been made, namely *H. L. Moore Drug Exchange v. Eli Lilly & Co., supra*, and *Schwimmer v. Sony Corp. of America*, 677 F.2d 946 (2d Cir. 1982). Both cases were brought under the antitrust laws and both involved judgments n. o. v. after jury verdicts in favor of the plaintiffs. In the *Moore* case, the trial judge had denied Lilly's motion for judgment n. o. v. This Court reversed and directed judgment dismissing the complaint on the theory that despite the jury's verdict the evidence did not constitute a violation of the antitrust laws.

The *Schwimmer* case followed on May 3, 1982. There the case arose out of a dealership termination and the claim that the termination was in violation of the antitrust laws. The assertion of error was the trial court's denial of a motion for judgment n. o. v. after a jury verdict in favor of the plaintiff Schwimmer. This Court reversed and remanded for the entry of a judgment in favor of the defendant. The Court reviewed at length its decision in the *Moore-Lilly* case and the record before it. After so doing, it came to the conclusion that "we find no evidence in the record from which the jury could reasonably have inferred that in 1976 or 1977 Sonam [Sony Corporation of America] and any of its customers entered into an agreement either express or tacit, to discourage transshipping with Sony

ence—is inherent in competition among sellers." *Ungar v. Dunkin' Donuts of America*,

*Inc.*, 531 F.2d 1211, 1226 (3d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976).

products". *Schwimmer v. Sony Corp. of America, supra,* at 953.

The Unijax case presents an *a fortiori* situation because here both the trial court and this Court find no evidence whatsoever of a tying agreement or any instance in which a conditioning requirement was even suggested. Accordingly, since there is a complete absence of evidence from which the jury reasonably could have found in Unijax's favor on its tying claim, we hold that the trial court properly granted Champion's motion for judgment n. o. v. on this claim.

■ The same principles which guided our evaluation of Unijax's antitrust claim lead us to conclude that no reasonable juror could have found that Champion tortiously interfered with Unijax's prospective business with Holiday Press, one of its major clients.[16]

Champion acquired the Holiday Press account through the efforts of Franklin Ray. In 1976, Ray, a fine paper salesman, resigned from the Unijax branch in Memphis and became an employee of Nationwide Papers, a division of Champion engaged in the distribution of fine paper products. At the time of Ray's resignation, Unijax's Memphis branch had an order from Holiday Press for the purchase of Armour Web, a line of fine paper manufactured by Champion. On the day of his departure, Ray instructed Lloyd Scott Barnard, Champion's district manager in St. Louis, to cancel the order for the Armour Web grade placed with Champion by Unijax on behalf of Holiday Press. Shortly after he joined Nationwide, Ray placed an order for Armour Web for Holiday Press through Nationwide, identical to the order which he had cancelled on the day of his departure.

■ While this evidence concerning this one Holiday Press order is sufficient to support the jury's conclusion that Ray's conduct constituted interference by Nationwide and Champion with an existing order between Unijax and Holiday Press, it is insufficient to sustain a finding that Champion tortiously interfered with Unijax's prospective business relations. Proof of malice or motivation to harm is indispensable to sustain a finding of tortious interference with prospective business advantage and to support an award of punitive damages. *North Carolina Mutual Life Insurance Company v. Plymouth Mutual Life Insurance Company,* 266 F.Supp. 231 (E.D.Pa.1967). Nationwide's efforts to secure the Holiday Press account were not motivated, however, by malice or desire to harm Unijax but by a desire to increase its profits. As the district court observed, "A business relationship existed [between Champion and Unijax] in which each sought the best advantage for itself from the transaction".

Since Unijax failed to present any evidence remotely relevant to the issue of malice, we hold that the district court properly granted Champion's motion for judgment n. o. v. on Unijax's Tennessee law claim of tortious interference with prospective business advantage.

Judgment affirmed.

---

16. Our extensive research reveals no indication that Tennessee case law has addressed the issue of whether that state recognizes the tort of interference with prospective business advantage. In *Taylor v. Nashville Banner Publishing Co.,* 573 S.W.2d 476, 485 (Tenn.App.1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979), the court questioned the existence of this tort, stating that the plaintiff "has cited no authority in support of this cause of action, nor even any to show such a tort is recognized in Tennessee". Outside of this brief allusion, however, no other case discusses this issue. We decline to hold that Tennessee does not recognize the tort of interference with prospective business advantage and for the purposes of this discussion, we adopt by implication the elements of proof set forth by the states in which this tort has been expressly recognized.