**FAMOUS BRANDS, INC., Appellant,**

v.

**DAVID SHERMAN CORPORATION, Appellee.**

**No. 86–5029.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 13, 1986.

Decided March 20, 1987.

---

518

Rick Johnson, Gregory, S.D., for appellant.

P. John Owen, Kansas City, Mo., for appellee.

Before LAY, Chief Judge, FAGG, Circuit Judge, and LARSON,* Senior District Judge.

---

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

LAY, Chief Judge.

Famous Brands, Inc. (Famous) brought this diversity action, claiming that it had an enforceable, exclusive contract for South Dakota distribution rights to Everclear grain alcohol, which is bottled by the David Sherman Corporation (Sherman). Sherman withdrew Everclear from Famous and granted South Dakota distribution rights to a third party, Premier Wine and Spirits, when Famous did not carry Sherman's entire line of liquors. Famous sued to enforce the alleged contract and brought additional counts for deceit and violation of the antitrust laws.

The district court[1] granted defendant Sherman's motion for summary judgment on all counts. The court had before it depositions, documents, affidavits, and the record from an earlier preliminary injunction hearing, at which Sherman prevailed. For the purposes of its summary judgment motion, Sherman accepted the plaintiff's evidence in its entirety. Sherman argues that based on the "undisputed" facts, Famous' claims are insufficient as a matter of law. The issue on appeal is whether summary judgment for Sherman was proper on each of the three counts raised in Famous' complaint. We affirm in part and reverse in part.

## Background

In 1982 Famous, a liquor wholesaler in Sioux Falls, South Dakota, began negotiating to buy Midland Distributors, another Sioux Falls wholesale house. After litigation[2] interrupted this attempt once, in late 1983 Famous resumed its effort to acquire Midland. According to Lynn Johnson, president of Famous, the ultimate purchase depended on Midland's suppliers' consent to continue to supply and do business with any purchaser of Midland.[3] He stated that the supply lines were "like assets."

Numerous contacts between Famous and Sherman were made, primarily because Sherman controlled Midland's supply of Everclear, a trademarked product that held over ninety percent of the grain alcohol market in South Dakota. On November 1, 1983, Paul Lux, the president of Sherman, wrote a letter to Famous stating: "[I]f [the Midland purchase] happens, I want you to know that we will be more than happy to have you distribute Everclear alcohol and any other brands that Midland will be selling for us." Later, Lux told Lynn Johnson that Famous could "count on" Sherman after Famous' purchase of Midland took effect.[4] On appeal, Sherman concedes these communications. Based on this background, according to Johnson's testimony,

1. The Honorable John B. Jones, United States District Judge for the District of South Dakota, presiding.

2. A dispute arose regarding the renewal of Famous' liquor license, causing extended litigation, but Famous ultimately prevailed. *See In re Famous Brands, Inc.,* 347 N.W.2d 882 (S.D. 1984).

3. A memorandum preceding the purchase agreement between Famous and Midland pointed up the significance of retaining supply lines. Paragraph 5(b) of the memo, dated December 28, 1983, stated one condition of the purchase:

   A determination by Famous Brands, Inc. that the major suppliers to Midland Distributing are prepared to permit Famous Brands, Inc. to sell and distribute their products subsequent to closing. (In fact, the principals of Famous Brands, Inc. have a high degree of confidence that such consents might be obtained. Therefore, I would actually contemplate that, should this letter of intent be deemed agreeable to the selling parties, we could then be making appropriate inquiries with suppliers and, hopefully, could eliminate this as a condition altogether in the preparation of a definitive agreement.).

4. Johnson testified that between January 1 and January 24, 1984, the latter date being when the purchase agreement was executed, he contacted Lux regarding distribution rights to the products Midland had been distributing for Sherman. Johnson's testimony was as follows:

   A: The conversation went something like this. I got a hold of Paul and told him that we finally, finally concluded a deal to purchase Midland and that we wanted to know from him if we could count on his Everclear alcohol remaining with us.
   Q: Did he respond to those comments or questions by you?
   A. He was glad to see that we concluded a deal. He was glad that we straightened out our little mess that we had in Rapid City. And that we could count on him.
   Tr. at 14 (hearing on preliminary injunction).

"Everclear was one of the franchises that we paid blue sky for."

Thereafter Sherman supplied primarily Everclear to Famous until February 20, 1985, when representatives of Sherman told Famous that it was being terminated because "you will not handle our proprietary lines." According to Lux, Sherman requires all its wholesale distributors to carry *all* of its lines. Famous refutes this by evidence that its successor to the Sherman line, Premier Wine and Spirits, carries only a few of the Sherman products. Midland also had carried only a few of Sherman's products besides Everclear.

Both parties, as reflected through the testimony of Johnson and Lux, indicate that a distributorship can continue indefinitely unless mutual problems cannot be resolved. Famous relies on this industry practice or custom for its claim that Sherman's statements created a perpetual, exclusive contract to distribute Everclear grain alcohol in South Dakota.

## Discussion

### 1. The Contract Claim

■ Based on the historical facts outlined above, the district court granted summary judgment for Sherman on two grounds: (1) the terms of the contract were indefinite; and (2) there was no mutuality of obligation. We find the district court erred in doing so.

Regarding the first point, South Dakota contract law recognizes the validity of implied contracts. *See* S.D. Codified Laws Ann. § 53-1-3 (1980 rev.). As the South Dakota Supreme Court has explained:

A contract is implied in fact where the intention as to it is not manifested by direct or explicit words by the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used, or acts done by them, or other pertinent circumstances attending the transaction.

*Mahan v. Mahan,* 80 S.D. 211, 121 N.W.2d 367, 369 (1963). An earlier South Dakota case held that "the facts are viewed objectively, and if a party voluntarily indulges in conduct reasonably indicating assent he may be bound even though his conduct does not truly express the state of his mind." *Federal Land Bank v. Houck,* 68 S.D. 449, 4 N.W.2d 213, 219–20 (1942); *see also Mitzel v. Hauck,* 78 S.D. 543, 105 N.W.2d 378, 380 (1960).

An agreement is not too indefinite to form a contract when the parties operated under it for over a year, as Famous and Sherman did. The evidence shows that Sherman readily supplied Everclear to Famous for distribution and Famous carried out its promotion and selling of Everclear throughout the year. Distributorship agreements are by their very nature indefinite, often being made definite only by the conduct of the parties, which reflects their intentions. We find under South Dakota law sufficient circumstances to at least create a jury question as to the existence of an implied contract between the parties.

Contracts should be construed according to the construction placed on them by the parties, as demonstrated by their contemporaneous and subsequent conduct. *See Malcolm v. Malcolm,* 365 N.W.2d 863, 865 (S.D.1985); *Huffman v. Shevlin,* 76 S.D. 84, 89, 72 N.W.2d 852, 855 (1955); *Janssen v. Muller,* 38 S.D. 611, 162 N.W. 393, 394 (1917).[5] To apply this doctrine to the present question of contract formation would uphold the long-standing South Dakota policy favoring validation of contractual relations. *See Kuhfeld v. Kuhfeld,* 292 N.W.2d 312, 315 (S.D.1980) (citing *Trumbauer v. Rust,* 36 S.D. 301, 154 N.W. 801 (1915); *Sarles v. Sharlow,* 5 Dak. 100, 37 N.W. 748 (S.D.1888); *Cheatham v. Wilbur,* 1 Dak. 335, 46 N.W. 580 (S.D.1876)).

To summarize, when an informal agreement is followed by conduct arguably pursuant to that agreement, the fundamental question of definiteness comes down to the understanding and intention of the parties:

---

**5.** As Professor Corbin's treatise on contract law stated: "Even though the parties have expressed an agreement in terms so vague and indefinite as to be incapable of interpretation with a rea-

sonable degree of certainty, they may cure this defect by their subsequent conduct and by their own practical interpretation." A. Corbin, *Corbin on Contracts* § 101, at 453 (1963).

did they intend to consent to a continual,[6] binding distributorship agreement? We find this to be a genuine issue of material fact that must be decided by the jury.

The trial court also found mutuality of obligation lacking in that Famous could cease doing business at any time, while Sherman allegedly could not. Here again we cannot agree. As this court stated in *Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.*, 395 F.2d 388 (8th Cir.1968), "'[m]utuality of obligation' is only a semantical exercise surrounding the real determinant of a contract, namely, consideration." *Id.* at 389. Although *Clausen* applied Minnesota law, it is clear that South Dakota law is supportive of the *Clausen* rationale. As stated in *Lien v. Northwestern Engineering Co.*, 73 S.D. 84, 39 N.W.2d 483, 488–89 (1949): "Where there is an agreement founded on a consideration, it is not invalid for want of mutuality because it is obligatory on one party and optional on the other."

Our inquiry thus turns to whether Famous produced sufficient evidence from which a factfinder could have found consideration. Under S.D.Codified Laws Ann. § 53–6–1, "consideration" is defined as "[a]ny benefit conferred or agreed to be conferred upon the promisor by any person to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer as an inducement to the promiser."

Famous points to its implied promise to promote Everclear as consideration for Sherman's "promise," a theory twice accepted by the Wisconsin Supreme Court. *See Simon Bros. Co. v. Miller Brewing Co.*, 83 Wis.2d 701, 266 N.W.2d 369, 372–73 (1978); *California Wine Ass'n. v. Wisconsin Liquor Co.*, 20 Wis.2d 110, 121 N.W.2d 308, 314 (1963). Sherman, on the other hand, dismisses any promise to promote as a "bootstrap" onto a nonexistent promise by Sherman. We read South Dakota law to support the proposition that *if* Sherman did promise to supply Everclear to Famous, then an implied return promise[7] by Famous to promote it would be consideration. Famous' promise would be contingent on Sherman fulfilling its promise to sell. *Cf. Endres v. Warriner*, 307 N.W.2d 146, 149 (S.D.1981) (finding adequate consideration in promise contingent on third party action). Contrary to Sherman's arguments, this is not an "illusory" promise. As Justice (now Circuit Judge) Wollman wrote for the South Dakota Supreme Court: "A promise is illusory 'only if it in no way limits the promisor's future action. * * * [Where a party has] impliedly promised to use his best effort [to carry out the goals of the contract] * * * there was adequate consideration." *Id.* (quoting *Douglas v. City of Dunedin*, 202 So.2d 787, 788 (Fla. Dist.Ct.App.1967)).

This arrangement also could be regarded as a "requirements" contract, under which Sherman promised to fill all of Famous' Everclear needs in return for Famous' promise to buy all of its Everclear from Sherman. South Dakota law recognizes requirements contracts. *See Teigen Const., Inc. v. Pavement Specialists, Inc.*, 267 N.W.2d 574, 578 (S.D.1978); S.D.Codified Laws Ann. § 57A–2–306(1) (applicable in transactions covered by the Uniform Commercial Code). Even if the promise to buy is implied, this is not invalid for lack of the promise to sell mutuality. *Teigen*, 267 N.W.2d at 578; *see also Sulzbach v. Town of Jefferson*, 83 S.D. 156, 155 N.W.2d 921, 923 (1968). Some other form of consideration, however, must be shown to support the re-

---

**6.** We deem it a question of fact for the jury as to the duration of such a contract; at the very least, Famous would be entitled to rely on the supply agreement, if the jury finds that one existed, for a reasonable time so as to recoup its investment in the promotion and sale of the Sherman product. *Cf. Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.*, 395 F.2d 388, 390–91 (8th Cir.1968); A. Corbin, *supra*, § 96 at 413–14.

**7.** S.D.Codified Laws Ann. § 57A–2–306(2) provides: "A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods *and by the buyer to use best efforts to promote their sale.*" (Emphasis added).

quirements contract. Under the Uniform Commercial Code, the prospective buyer's good faith in filling all of its requirements through the seller is deemed sufficient consideration to support the contract.[8] This rationale would support a finding of consideration if a jury finds facts indicating a promise by Sherman.

■ Another alternative theory of consideration is promissory estoppel. Under this theory, Famous can show that by purchasing Midland it justifiably and detrimentally relied on Sherman's promises to supply Everclear. The promissory estoppel doctrine holds that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Restatement (Second) of Contracts* § 90(1) (1981); *see Northwestern Eng'g Co. v. Ellerman,* 69 S.D. 397, 10 N.W.2d 879, 883 (1943) (adopting promissory estoppel in South Dakota); *Valley Bank v. Dowdy,* 337 N.W.2d 164, 165–66 (S.D.1983) (applying promissory estoppel theory); *Clausen,* 395 F.2d at 390 (same). Famous has produced sufficient facts from which a reasonable factfinder could infer reasonable reliance by Famous that Sherman should have anticipated. Thus, under a promissory estoppel theory as well as ordinary consideration, the district court erred in granting Sherman's motion for summary judgment.

### 2. Deceit

■ Fraudulent intent is an element of deceit under S.D.Codified Laws Ann.

§§ 20–10–1 and 20–10–2.[9] In the present situation, to avoid summary judgment Famous must offer some evidence of Sherman's deceitful intent when Sherman made its alleged promise. *Cf. Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (summary judgment was proper when the plaintiff produced no evidence on an essential element of her claim). Under the present state of the record the only "evidence" is the fact that Sherman later terminated Famous. This conduct fails to show *contemporaneous* intent; in fact, the evidence indicates that only after it discovered that Famous wasn't carrying its various products, did Sherman decide to take Everclear away.

Thus, we conclude that Famous has failed to produce any evidence from which an inference of deceit is possible. When the plaintiff fails to meet its burden of production, summary judgment is proper.

### 3. Antitrust

■ In its antitrust count, Famous claims that Sherman tied the sale of Everclear, a product desired by Famous, to the purchase of other products Famous did not desire. Tying arrangements are one category of anticompetitive activity regarded as per se illegal under section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), and section 3 of the Clayton Act, 15 U.S.C. § 14 (1982).[10] "A tie exists when a seller, having a product which buyers want (the 'tying product'), refuses to sell it alone and insists that any buyer who wants it must also purchase another product (the 'tied product')." L. Sullivan, *Antitrust* § 150,

---

**8.** *See* U.C.C. § 2–306 comment 2:

[A] contract for * * * requirements is not too indefinite since it is held to mean the actual good faith * * * requirements of the particular party. Nor does such a contract lack mutuality of obligation since, under this section, the party who will determine quantity is required to * * * conduct his business in good faith and according to commercial standards of fair dealing in the trade so that his * * * requirements will approximate a reasonably foreseeable figure.

**9.** S.D.Codified Laws Ann. § 20–10–1 provides: "One who willfully deceives another, with intent

to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Deceit is defined in § 20–10–2(4) as follows: "A promise made without any intention of performing."

**10.** On appeal, Famous does not advance any theory of liability under the Clayton Act. Sherman's brief indicates that Famous "expressly abandoned" the Clayton Act claim during the pretrial conference. However, because the trial court mentioned the Clayton Act in granting summary judgment, we will pass upon the section 3 claim here. Inclusion of that issue will not change our result on the antitrust count.

at 431 (1977). The district court rejected Famous' antitrust claims because Famous did not buy the tied products.

A severe hurdle faces Famous in its attempt to prevail under section 1 of the Sherman Act; Famous must show a contract, combination, or conspiracy. In *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Supreme Court reiterated the "distinctions" that are "at the center of this and any other distributor-termination case." *See id.* at 760–61, 104 S.Ct. at 1469–70. As to the first distinction,[11] the Court wrote:

> [T]here is the basic distinction between concerted and independent action—a distinction not always clearly drawn by parties and courts. Section 1 of the Sherman Act requires that there be a "contract, combination ... or conspiracy" between the manufacturer and other distributors in order to establish a violation. 15 U.S.C. § 1. Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently. *United States v. Colgate & Co.*, 250 U.S. 300, 307 [39 S.Ct. 465, 468, 63 L.Ed. 992] (1919); *cf. United States v. Parke, Davis & Co.*, 362 U.S. 29 [80 S.Ct. 503, 4 L.Ed.2d 505] (1960).

*Id.* at 761, 104 S.Ct. at 1469.

*Monsanto* thus reaffirmed the doctrine of *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919):

> The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of [a] trader or manufacturer en-

gaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell. "The trader or manufacturer, on the other hand, carries on an entirely private business, and can sell to whom he pleases * * *." *United States v. Trans-Missouri Freight Association*, 166 U.S. 290, 320 [17 S.Ct. 540, 551, 41 L.Ed. 1007 (1897)].

*See also Russell Stover Candies, Inc. v. FTC*, 718 F.2d 256, 259–60 (8th Cir.1983) (following *Colgate*).

Later in the *Monsanto* opinion the Court discussed the evidentiary standards applicable under section 1: "[T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' *Edward J. Sweeney & Sons, [Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)]." 465 U.S. at 764, 104 S.Ct. at 1471.

Famous failed to show that some distributor agreed to purchase tied products in return for availability of Everclear. As the district court suggested, because Famous at all times refused to purchase tied products from Sherman, no concert of action existed between them. *See Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 685 (2d Cir.1982) ("Actual coercion by the seller that in fact forces the buyer to purchase the tied product is an indispensable element of a tying violation."). Thus, Famous is left to rely on Sherman's later relationship with Premier Wine and Spirits, the successor to Famous, as evidence of a tying contract. *See Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 142, 88 S.Ct. 1981, 1986, 20 L.Ed.2d 982 (1968) (plaintiff can show antitrust combination when third party acquiesced to defendant's demands); *Black Gold, Ltd. v.*

---

**11.** The second distinction is between price and nonprice restrictions, an issue not presented in the present context.

*Rockwool Indus., Inc.,* 729 F.2d 676, 686 (10th Cir.1984) (applying *Perma Life* in tying case).

There is no illegal concert of action if Sherman simply substituted Premier for Famous in an attempt to find a more active distributor of Sherman's products. *Unijax,* 683 F.2d at 685; *Dreibus v. Wilson,* 529 F.2d 170, 173–74 (9th Cir.1975); *Ricchetti v. Meister Brau, Inc.,* 431 F.2d 1211, 1214–15 (9th Cir.1970), *cert. denied,* 401 U.S. 939, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971). The Second Circuit in *Unijax* termed a similar withdrawal of the desired product from an unwilling distributor "nothing more than aggressive salesmanship." 683 F.2d at 685. We find no evidence in the record that Premier acquiesced in any type of tying relationship. The fact that Premier later may have distributed some of Sherman's other products is inconclusive at best. In fact, the record shows, and Famous acknowledges, that Premier primarily purchased Everclear from Sherman. There is no evidence that Premier and Sherman acted in concert to restrict competition in the sale of any liquor products in South Dakota.

■ Section 3 of the Clayton Act, 15 U.S.C. § 14 (1982), proscribes sales made on the condition that the buyer not use or deal in competing products. Just as in section 1 of the Sherman Act, this provision requires proof that a buyer acquiesced in such an arrangement. There is no evidence of a contract under which Famous or Premier would deal exclusively in Sherman's products. All available evidence is to the contrary; Famous concedes that it sold other products, and Famous apparently has abandoned any effort to show that Premier was forced to buy and sell only Sherman's products. The record indicates instead that Sherman would have been satisfied to "share" a distributor, as long as that party aggressively marketed all of Sherman's products.

Under *Celotex* we must conclude that there is no genuine issue of material fact outstanding as to the antitrust claims.

## Conclusion

Genuine issues as to material facts remain only on the contract claim. The district court in its short statement from the bench assumed some facts, without the aid of a full trial. It is true that the summary judgment procedure is intended to avoid unnecessary trials. In this case, however, we are not convinced that trial was unnecessary. While the district court may have correctly assessed the merits of the plaintiff's claims, doing so before trial left material issues of fact unsettled.

As to the deceit and antitrust claims, however, we are convinced that summary judgment was properly entered. Famous has produced no genuine issue as to any material facts on those claims and Sherman is entitled to judgment as a matter of law.

Accordingly, for the reasons discussed in this opinion, the judgment of the district court on the contract claim is reversed and remanded for trial; the judgment of the district court on the deceit and antitrust claims is affirmed.